FOURTH DIVISION

    May 20, 2004

No. 1-03-2012

STEVEN A. RHOADS, )    Appeal from

) the Circuit Court

Plaintiff-Appellee, ) of Cook County.  

) 

v. ) No. 02 CH 7479

)

THE BOARD OF TRUSTEES OF THE CITY OF )     

CALUMET CITY POLICEMEN'S PENSION FUND, )      Honorable

)  Nancy J. Arnold,

Defendant-Appellant. )   Judge Presiding.

JUSTICE THEIS delivered the opinion of the court:

Defendant Board of Trustees of the City of Calumet City Policemen's Pension Fund (the Board) appeals from an order of the circuit court which, on administrative review, reversed the Board's decision to revoke plaintiff Steven A. Rhoads' not-on-duty disability pension.  On appeal, the Board argues that (1) the trial court lacked jurisdiction to review Rhoads' complaint when Rhoads failed to name parties of record as defendants under section 3-107(a) of the Administrative Review Law (735 ILCS 5/3-107(a) (West 2000)); and (2) the trial court erred in finding that Rhoads was entitled to a disability pension because his former position of chief of police was not available despite the fact that Rhoads was discharged from that position.  For the following reasons, we reverse the decision of the circuit court and affirm the Board's ruling.  

Rhoads received his appointment as chief of police of the City of Calumet City on May 24, 1988.  On May 11, 1993, Rhoads submitted his application for a line-of-duty disability pension.  On May 13, 1993, Rhoads was terminated from his position as police chief when a new mayor was elected.  He did not contest his discharge.  The City of Calumet City Police Pension Board denied his application for a line-of-duty disability pension, but granted Rhoads a not-on-duty disability pension under section 3-114.2 of the Illinois Pension Code (the Code) (40 ILCS 5/3-114.2 (West 1994)) on January 31, 1995, as a result of an injury to his left knee.  Rhoads then filed a complaint for administrative review, and the circuit court reversed the Board's decision and granted Rhoads a line-of-duty disability pension.  The Board appealed to this court, which reversed the decision of the circuit court and found that the Board's decision to grant Rhoads a not-on-duty pension was not against the manifest weight of the evidence.  
Rhoads v. Board of Trustees of the City of Calumet City Policemen's Pension Fund
, 293 Ill. App. 3d 1070, 689 N.E.2d 266 (1997). 

In 2001, the Board held administrative hearings under section 3-116 of the Code (40 ILCS 5/3-116 (West 2000)) to determine whether Rhoads continued to be disabled and, thus, could continue to receive a not-on-duty disability pension; or whether Rhoads had recovered sufficiently and was able to resume the duties of his position, necessitating the termination of his disability pension.  Richard Cyr testified that the Board's attorney hired him as a private investigator to take video surveillance of Rhoads working as a rodeo clown in 1998.  He stated that he videotaped Rhoads on five different occasions for a total of five hours.  Cyr testified that he did not edit the film, but only taped portions of each rodeo when Rhoads was performing.  He did not see any chiropractors at the rodeos and stated that Rhoads did not limp or have a problem climbing in and out of the barrel.  Cyr identified Exhibit H as the videotape he took at the Danville rodeo on July 18, 1998, which was then offered into evidence and viewed by the Board.

Ray Cox testified for Rhoads that he owns a rodeo school.  He stated that he hired Rhoads as a comic clown or a funny man, but testified that Rhoads could not be a bull fighter clown because he had bad knees.  He did not have chiropractors at his rodeos.  Rhoads worked for Cox approximately 25 to 28 times between 1998 and 2001.  Cox saw Rhoads limp before and after performances and observed Rhoads ice his knees when they were swollen.  The July 18, 1998 rodeo was not one of Cox's rodeos.  Georgia Knotts testified for Rhoads that she was a nurse who provided ice to performers at rodeos.  She saw Rhoads perform at a rodeo in 1998 and gave him ice for his knees, but never saw a chiropractor work on him.  She stated that Rhoads did not perform during the entire rodeo and placed ice on his knees between performances.  Knotts also observed him with a limp and stated that he wore braces on his knees during performances.  

George Vallis, chief of police of the City of Calumet City police department, testified that he held that position since May 1995.  In July or August of 2001, Vallis told Rhoads that there were no full-time or permanent light-duty positions available in the police department.  He stated that the chief of police serves at the pleasure of the mayor and could be fired at any time.  His position, for the most part, was executive, managerial and administrative.  Vallis testified that the mission statement of the department stated that he must be able to perform the duties of a patrol officer.  Vallis testified that Rhoads could not return as chief of police.  

Rhoads testified that he started "Christian clowning" in 1989 and began working as a comedy clown in rodeos in 1993.  He stated that his knees tightened up and he was in pain and used chiropractors when they were available at rodeos.  He also iced his knees on a regular basis.   In 1998, Rhoads was involved in between 20 and 25 rodeos.  At the rodeos, he interacts with children, does Gospel magic tricks and entertains the crowd.  He stated that he performed in fewer rodeos in 1999, 2000 and 2001 because he did not have the physical capacity to do that many shows.  Rhoads stated that he could do light-duty work at the police department, but could not respond as a police officer because of his physical limitations.  He stated he can no longer perform at rodeos as he did in the videotape due to his knee and back problems, but he admitted that he was on the videotapes.  

Dr. William Malik's report dated June 22, 1999, was admitted into evidence.  In that report, Dr. Malik indicated that he evaluated Rhoads that day and found him to have chondromalacia of the left knee and degenerative disease in his back.  Based on Rhoads' knee and back problems, he would be disabled from full-duty employment as a police officer.  In a letter dated March 6, 2000, Dr. Malik amended his prior report and stated that Rhoads could return to full-duty employment as a supervising law enforcement officer, which would consist of medium workload activities.  Rhoads could lift up to 50 pounds and could perform frequent lifting and carrying of up to 25 pounds.  In his report dated March 29, 2001, Dr. Robert Miller diagnosed Rhoads with chondromalacia of the left knee and stated that he was disabled with respect to that knee.  He stated that his disability was relative and prevented him from performing the duties of an ordinary police officer, but was not so severe as to preclude him from working in an administrative position in a police department or prevent him from functioning "perfectly well administratively as a police chief."

In its decision dated March 12, 2002, the Board made the following factual findings.  By ordinance, the chief of police of the City of Calumet City is appointed and can be removed by the mayor.  In 1998, an investigative firm took video surveillance of Rhoads performing as a rodeo clown on five different occasions in order to ascertain whether his employment and physical activities since receiving his disability pension were inconsistent with his receipt of the pension.  The Board found Cyr's testimony relevant, probative and credible and determined that the video showed Rhoads running, jumping, climbing fences, dancing, running from bulls, leaping on top of and off a barrel, climbing into a barrel, carrying the barrel and being rammed by a bull while crouched inside the barrel.  Rhoads did not dispute that he performed these activities and the Board found that these activities were "totally contradictory" to Rhoads' claim of continuing disability to his left knee and his claim that he was presently disabled from performing the duties and functions of chief of police.  Dr. Malik's report indicated that Rhoads would be disabled from full-duty employment as a police officer, but Rhoads could return to full-duty employment as a supervisory law enforcement officer.  Dr. Miller stated that Rhoads could function perfectly well administratively as a police chief.  Rhoads did not introduce any current medical reports that would indicate he was still disabled and unable to perform the duties of the City of Calumet City police chief.

Cox testified that putting a clown in a barrel with a charging bull was a dangerous stunt and that the barrels weighed between 90 and 120 pounds.  While Cox testified that Rhoads "gets into a barrel like an old man," the Board stated that it observed Rhoads jumping in and on top of these barrels as well as carrying these barrels with no apparent difficulty.  The Board found that the videotape was not altered or edited and accurately portrayed Rhoads performing various rodeo activities.  The Board was not persuaded by Rhoads' testimony and found his demeanor to be "unpersuasive, uncorroborated and not credible in light of the videotapes."  The Board additionally found that the video "clearly demonstrate[d]" that Rhoads was not disabled from performing his duties as chief of police.  

The Board concluded that the doctors who examined Rhoads indicated that he was physically able to perform the police duties that he previously performed which were administrative in nature and Rhoads offered no competent medical evidence to contradict these reports.  The Board also found that "[w]hat position the City of Calumet City has for Steven A. Rhoads is not relevant to whether or not he is disabled."  The Board terminated Rhoads' not-on-duty disability pension and ordered a certificate to issue stating that Rhoads was no longer disabled and was able to resume the duties of his position.  

Rhoads filed a complaint for administrative review in the circuit court, naming as defendants the Board, the City of Calumet City and Vallis.  Rhoads argued that the Board's decision was against the manifest weight of the evidence and that he should have been offered a light-duty position when the Board determined that he was fit for such work.  All parties then filed motions to dismiss.  The participants and beneficiaries of the pension fund also filed a motion to dismiss, which the Board adopted, contending that Rhoads failed to name them as defendants in the administrative review action and thus, pursuant to section 3-107(a) of the Administrative Review Law, Rhoads' complaint had to be dismissed.  On October 31, 2002, the trial court dismissed the City of Calumet City and Vallis, but found that the participants and beneficiaries had no standing to bring a motion to dismiss and struck their motion.  The court then denied the Board's motion to dismiss for failure to name the participants and beneficiaries of the pension fund. 

Following a hearing, the court found that the Board's factual findings were explicit, appropriately related to Rhoads and adequately supported by the evidence and rejected Rhoads' argument that the decision terminating Rhoads' not-on-duty disability pension was against the manifest weight of the evidence.   However, the trial court reversed the Board, finding that Rhoads should continue to receive a disability pension because his previous position of police chief had not been made available to him, despite the fact that he had been discharged from that position.  The Board then filed this timely appeal.

The Board first argues that the trial court erred in denying its motion to dismiss Rhoads' complaint.  It contends that the court lacked jurisdiction over the complaint when Rhoads failed to name the participants and beneficiaries of the pension fund as defendants under section 3-107(a).  The Board cites several instances in the record where it indicated that Richard Puchalski was appointed special counsel to represent the interests of the participants and beneficiaries of the pension fund and, thus, argues that they were parties of record to the proceedings before the administrative agency and were required to be named in the complaint. 

A motion to dismiss under section 2-619 of the Illinois Code of Civil Procedure (735 ILCS 5/2-619 (West 2000)) admits the legal sufficiency of the plaintiff's claim, but asserts certain defects or defenses outside the pleading that defeat the claim.  
Wallace v. Smyth
, 203 Ill. 2d 441, 447, 786 N.E.2d 980, 984 (2002).  Our standard of review is 
de novo
.  
Wallace
, 203 Ill. 2d at 447, 786 N.E.2d at 984. 

Section 3-107(a) of the Administrative Review Law provides in relevant part:

"[I]n any action to review any final decision of an administrative agency, the administrative agency and all persons, other than the plaintiff, who were parties of record to the proceedings before the administrative agency shall be made defendants."  735 ILCS 5/3-107(a) (West 2000).    

The consequence for a plaintiff's failure to name a party of record is the dismissal of his complaint.  
Veazey v. Baker
, 322 Ill. App. 3d 599, 604, 749 N.E.2d 1060, 1063 (2001).  

In this case, the participants and beneficiaries of the pension fund were not parties of record to the administrative proceedings under section 3-107 and did not need to be named as defendants.  We find 
Thurow v. Police Pension Board
, 180 Ill. App. 3d 683, 536 N.E.2d 155 (1989), instructive.  In 
Thurow
, this court held that the pension board had the authority to appoint independent counsel to conduct the examination of witnesses and present evidence.  The court additionally agreed with the pension board's practice of having one attorney to represent the pension board, another independent attorney to act as the prosecutor by examining witnesses and presenting evidence and a third attorney to represent the police officer.  
Thurow
, 180 Ill. App. 3d at 689, 536 N.E.2d at 159.  

Here, while the administrative record occasionally states that Puchalski was appointed to represent the participants and beneficiaries of the pension fund, Puchalski later explained the true nature of his role in the proceeding.  By referencing this holding in 
Thurow
, he explained that: 

"I have been appointed special counsel to represent the Pension Board in the presentation of evidence concerning the disability of Steven Rhoads.

Now, the Appellate Court has said that it is appropriate to have two attorneys.  I know on most Pension Board cases you don't, but it is appropriate to have two attorneys in certain cases: one to advise the Board, which is what Mr. Pagorek will do, and one to present evidence and examine the witnesses, which is my role in this proceeding today and tomorrow." 

Throughout the administrative hearing, Puchalski presented an opening statement, examined witnesses, offered exhibits, and submitted a posthearing brief while Pagorek directed the proceeding and provided legal guidance to the Board.  Based on this record, we find that Puchalski acted solely as this second attorney under 
Thurow
 to present evidence and examine witnesses.  Puchalski's participation did not add an additional party to the administrative hearing and did not convert the participants and beneficiaries of the pension fund into parties of record.  Thus, Rhoads was not required under section 3-107(a) to name them as defendants in his complaint for administrative review and the trial court properly denied the Board's motion to dismiss.  

Next, we review the Board's decision to terminate Rhoads' not-on-duty disability pension  because he was no longer disabled.  In reviewing a final decision under the Administrative Review Law, we review the agency's decision and not the trial court's determination.  
Martino v. Police Pension Board
, 331 Ill. App. 3d 975, 979, 772 N.E.2d 289, 293 (2002).  The finding and conclusions of an administrative agency on questions of fact are deemed 
prima facie
 true and correct and will not be disturbed unless they are against the manifest weight of the evidence.  
Trettenero v. Police Pension Fund
, 333 Ill. App. 3d 792, 801, 776 N.E.2d 840, 849 (2002).  The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings.  
Trettenero
, 333 Ill. App. 3d at 801-02, 776 N.E.2d at 849.  Additionally, it is not the function of the appellate court 
to reevaluate witness credibility or resolve conflicting evidence.  
Ulysse v. Lumpkin
, 335 Ill. App. 3d 886, 893, 781 N.E.2d 415, 420 (2002).  
When the issue is one of law only, the agency's decision is reviewed 
de novo
.  
Martino
, 331 Ill. App. 3d at 980, 772 N.E.2d at 293.   

An officer's disability pension is contingent on his continued disability, and if he recovers from the disability, the Board may revoke his disability pension.  
Martino
, 331 Ill. App. 3d at 981, 772 N.E.2d at 294.  Section 3-116 of the Code provides the procedure for determining whether the officer has recovered from his disability and whether that pension may be revoked and states in relevant part: 

"A police officer whose duty is suspended because of disability may be summoned to appear before the board, and to submit to an examination to determine fitness for duty.  The officer shall abide by the board's decision.  If a police officer retired for disability, except one who voluntarily retires after 20 years' service, is found upon medical examination to have recovered from disability, the board shall certify to the chief of police that the member is no longer disabled and is able to resume the duties of his or her position."  40 ILCS 5/3-116 (West 2000). 

 After reviewing the transcript of the hearings before the Board, watching the videotape and examining the exhibits, we find that there was sufficient evidence to support the Board's factual findings and decision to terminate Rhoads' disability pension.  Both Dr. Malik and Dr. Miller found that while Rhoads continued to be disabled and could not work as an ordinary police officer, his disability did not prevent him from functioning as a supervising law enforcement officer in an administrative position within the police department, such as his former position of police chief.  Rhoads presented no contrary medical evidence to indicate that he was unable to perform the duties of chief of police.  Additionally, the Board relied heavily on the videotape of Rhoads' activities as a rodeo clown, which the Board determined was not altered or edited.  We agree with the Board that the video shows Rhoads running, jumping, climbing fences, dancing, running from bulls, leaping on top of and off a barrel, climbing into a barrel, carrying the barrel and being rammed by a bull while crouched inside the barrel.  These activities were inconsistent with his claim of continuing disability to his left knee.  The Board made credibility determinations finding Cyr's testimony credible and determining that Rhoads' demeanor was "unpersuasive, uncorroborated and not credible in light of the videotapes" and that the doctors' reports and videotape were more credible and persuasive than Rhoads' testimony.

Rhoads argues that he continues to be disabled and could not return to his position as police chief.  He cites Vallis' testimony that the mission statement of the police department states that the police chief must be able to function as a police officer and Dr. Miller's and Dr. Malik's statements that Rhoads could not return to full duty as a police officer as a result of his disability.  However, the Board cited the City of Calumet City's ordinance, which was offered into evidence by Rhoads, describing the duties of the chief of police.  See Calumet City Code § 20-6.  All the duties outlined in this ordinance are purely supervisory and do not require any physical demands of the police chief or that the chief be able to function as a patrol officer.  Accordingly, we reject Rhoads' argument.  Therefore, we find that the Board's factual findings were adequately supported by the evidence and its decision to terminate Rhoads' disability pension because he was no longer disabled was not against the manifest weight of the evidence.   

Lastly, the Board challenges the trial court's decision to award Rhoads a disability pension because his former position of chief of police was not available to him despite the fact that Rhoads was no longer disabled and was discharged from his position.  The Board contends that neither section 3-116 of the Code nor case law supports the court's holding that a police officer receiving a disability pension who recovers from his disability can continue to receive a disability pension after he is discharged and cannot be returned to his previous position.  Rhoads responds that the Board cannot deny him a not-on-duty disability pension while at the same time not offer him a position with the department. 

Under section 3-116 of the Code, as set forth above, the Board has the authority to terminate an officer's disability pension if the officer is found, upon medical examination, to have recovered from his disability.  In that situation, section 3-116 provides that the Board will certify to the chief of police that the member is no longer disabled and is able to resume the duties of his position.  40 ILCS 5/3-116 (West 2000).  The statute does not require that a position be available for the officer upon the termination of his disability pension.  Additionally, police officers on disability pensions are not subject to recall to active duty upon recovery from their disability.  
Greenan v. Board of Trustees of the Police Pension Fund
, 213 Ill. App. 3d 179, 185, 573 N.E.2d 825, 829 (1991).  The Board's certification under section 3-116 "does not require the pensioner be returned to duty, nor does it provide an absolute right to his or her old position."  
Greenan
, 213 Ill. App. 3d at 185, 573 N.E.2d at 829.  Additionally, the 
Greenan
 court found that even though a police officer's resignation from the police department did not bar his right to a disability pension, that officer would not be entitled to a pension if he was not disabled.  
Greenan
, 213 Ill. App. 3d at 187, 573 N.E.2d at 830.  The fact that an officer was discharged precludes the possibility of any reinstatement.  
Freberg v. Board of Trustees of the Firemen's Pension Fund
, 128 Ill. App. 2d 369, 374, 262 N.E.2d 22, 25 (1970).

Here, Rhoads, as chief of police, held an appointed position and could be removed at any time by the mayor and was, in fact, discharged from that position.  This is not a situation where Rhoads remained employed by the police department and was merely on disability leave while he received his pension.  His employment with the department was terminated completely at the time he was discharged on May 13, 1993.  Under the Code, the Board has the power only to grant or terminate a disability pension based on the officer's ability to perform his position and has no authority to order the City of Calumet City police department to rehire Rhoads.  It is exclusively within the police department's province to decide whether to rehire Rhoads, and in this case, it decided not to.  The department's decision does not impact whether Rhoads continued to be disabled and has no bearing on the Board's decision to terminate his disability pension.  As the Board correctly noted in its decision, "[w]hat position the City of Calumet City has for Steven A. Rhoads is not relevant to whether or not he is disabled."  

We note that neither Rhoads nor the trial court acknowledged the above-quoted language from 
Greenan
 and instead relied on several other cases, all of which are distinguishable.  These cases all involve the award of a disability pension, not the termination of such a pension, and none of them support Rhoads' claim that he was entitled to a light-duty position with the police department following his termination.  In 
Iwanski v. Streamwood Police Pension Board
, the court determined that an officer could receive a disability pension which he applied for while employed with the department despite the fact that he was later discharged.  
Iwanski v. Streamwood Police Pension Board
, 232 Ill. App. 3d 180, 190, 596 N.E.2d 691, 698 (1992).  The 
Iwanski
 court did not hold that the officer would be entitled to his position upon termination of his disability and, in fact, quoted the above-quoted language from 
Greenan
 that the board's certification under section 3-116 did not require the officer to be returned to duty and the officer had no absolute right to his job.  Thus, 
Iwanski
 is inapplicable.  

In 
Thurow
, the court reversed the board's denial of an officer's disability pension because, although the officer was capable of performing light-duty work, the officer testified that he was not offered a light-duty position and the record was insufficient to determine whether such a light-duty position existed.  
Thurow
, 180 Ill. App. 3d at 690-92, 536 N.E.2d at 159-60.  The officer in 
Thurow
 filed for a disability pension while he was on temporary total disability leave and was never terminated.  Thus, the officer remained employed with the department and could be assigned to another position when his disability pension was terminated.  However, in the present case, Rhoads was discharged from his position.  See also 
Peterson v. Board of Trustees of the Firemen's Pension Fund
, 54 Ill. 2d 260, 296 N.E.2d 721 (1973) (remanding to the board to determine whether a light-duty position was available where the fireman was capable of performing light-duty work; however, fireman was on a leave of absence from the department during the disability pension proceedings and was never terminated); 
Danko v. Board of Trustees of the City of Harvey Pension Board
, 240 Ill. App. 3d 633, 608 N.E.2d 333 (1992) (reversing the board's decision, finding that the pension board which denied officer a disability pension was biased against the officer and no light-duty position was available; however, the officer remained employed with the department during the disability pension proceedings and was not terminated). 

Lastly, 
Terrano v. Retirement Board of the Policemen's Annuity and Benefit Fund
, 315 Ill. App. 3d 270, 733 N.E.2d 905 (2000), is also distinguishable.  In 
Terrano
, the court reversed the board's decision denying the officer disability benefits, finding that he could only perform light-duty work and the department never offered him a light-duty position.  The court determined that the police department should have offered the officer a light-duty position between the time when the department learned of his physical limitations and the date that he was terminated when his employment with the department ended.  The 
Terrano
 court did not hold that the department was required to offer the officer a light-duty position after he was discharged.  Therefore, all the cases cited by Rhoads are distinguishable.

Accordingly, we find no legal support for the trial court's decision that Rhoads must continue to receive a disability pension even though he is no longer disabled and discharged from the department solely because his former position of chief of police was no longer available.  Additionally, we find that the Board's decision to terminate Rhoads' disability pension because he is no longer disabled is not against the manifest weight of the evidence.  

For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and affirm the Board's decision terminating Rhoads' not-on-duty disability pension. 

Circuit court reversed; pension board affirmed.

HARTMAN and GREIMAN, J.J., concur.